**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on January 21, 2022, which may be different from its entry on the record.**

**IT IS SO ORDERED.**

**Dated: January 21, 2022**



ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | Case No. 18-16598 |
| | ) | |
| FREDERICK D. HARRIS & | ) | Chapter 13 |
| BERNICE R. HARRIS, | ) | |
| | ) | Judge Arthur I. Harris |
| Debtors. | ) | |

### MEMORANDUM OF OPINION[1]

On April 30, 2019, the debtors Frederick D. Harris ("Dr. Harris") and

Bernice R. Harris objected to claim number 19 filed by Synovus Bank

("Synovus"), as successor by merger to Global One Financial, Inc. ("Global One").

Synovus's claim stems from a loan that Dr. Harris personally guaranteed to fund

the purchase of life insurance. The debtors argue that Synovus's claim is

unenforceable under 11 U.S.C. § 502(b) for various reasons, including because

---

[1] This Opinion is not intended for official publication.

Global One and/or its agents allegedly fraudulently induced Dr. Harris to sign a personal guaranty. For the reasons that follow, the debtors' objection is overruled, and Synovus's claim for $122,338.11 is allowed as filed.

## JURISDICTION

This Court has jurisdiction over this objection. An objection to a claim is a core proceeding under 28 U.S.C. § 157(b)(2)(B). This Court has jurisdiction over core proceedings under 28 U.S.C. §§ 157(a) and 1334 and Local General Order No. 2012-7, entered by the United States District Court for the Northern District of Ohio.

## PROCEDURAL HISTORY

On July 13, 2017, Synovus filed suit against Dr. Harris and Lonnie D. Sloan in the United States District Court for the Northern District of Georgia. Case No. 1:17-cv-02635-AT. Synovus sued Mr. Sloan in his capacity as trustee for an irrevocable life insurance trust or ILIT called the Frederick D. Harris Irrevocable Trust ("the ILIT"). In the federal lawsuit in Georgia, Synovus alleged that it had made a loan to the ILIT for the purchase of a life insurance policy, that the ILIT had defaulted on the loan in February 2017, and that Dr. Harris had personally guaranteed the loan.

2

On November 1, 2018, the debtors filed for chapter 13 bankruptcy in this Court, thereby staying the federal lawsuit in Georgia before the district court could make any decision on the merits. On January 8, 2019, Synovus timely filed a proof of claim for $122,338.11 allegedly due under Dr. Harris's personal guaranty of the loan Global One extended to the ILIT. On April 30, 2019, the debtors objected to Synovus's claim, arguing it was "highly speculative, improper, unliquidated and premature" (Docket No. 55). Synovus responded in opposition (Docket No. 62), the debtors supplemented their objection (Docket No. 77), and Synovus responded to the debtors' supplement (Docket No. 81). The parties filed several additional briefs (Docket Nos. 218, 223, and 224) before an evidentiary hearing, which took place on September 30 and October 1, 2021.

During the hearing, the Court heard testimony from Dr. Harris, Mr. Sloan, and Jonathan D. Rosen, the founder of Global One and then chief executive officer of Synovus's specialty finance division. Subject to further redaction under Bankruptcy Rule 9037, the Court received without objection Synovus's Exhibits 1 through 34 and the debtor's Exhibits A through ZZZ, except for the debtor's Exhibit P. The Court did not admit Exhibit P, an expert report prepared by Mr. Sloan. The parties orally stipulated to Synovus being a successor in interest to Global One with standing to assert its claim.

3

Sadly, only a week after the evidentiary hearing, Mr. Rosen died when a plane he was piloting crashed in Georgia. Also killed in the plane crash were Mr. Rosen's teenage daughter, a teenage friend of the daughter, and Mr. Rosen's executive assistant, Lauren Harrington, who had attended the evidentiary hearing with Mr. Rosen.

In light of these circumstances, the Court held a conference call with the attorneys and requested that the parties consider one last try at reaching a consensual agreement. After being advised on November 10, 2021, that the parties had agreed to mediation, the Court referred the matter to mediation before Chief Judge Mary Ann Whipple. On December 13, 2021, Chief Judge Whipple reported that the parties were unable to reach a consensual resolution.

## FINDINGS OF FACT

The findings of fact in this memorandum of opinion reflect the Court's weighing of the evidence, including the credibility of the witnesses. "In doing so, the court considered the witnesses' demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language, or nuance of expression." *In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically mentioned in this opinion, the Court considered the testimony of all the witnesses and all the

4

exhibits admitted into evidence. Unless otherwise indicated, the following facts were established by a preponderance of the evidence.

Dr. Harris is a physician who graduated from Case Western Reserve University School of Medicine in 1985. Since 2005, he has practiced at the Cleveland Clinic as a salaried primary care physician. His salary in 2013 was approximately $390,000 per year. By 2014, despite his income, Dr. Harris was struggling financially. He was behind on his mortgage, carrying a lot of debt, and paying for several of his seven children to attend college.

In early 2014, one of Dr. Harris's friends introduced him to Byron Holley at Legacy Point Capital ("Legacy Point"), an investment banking and advisory firm. Bryon Holley jointly owned and managed Legacy Point with John Loudon. While Dr. Harris already had approximately $5,000,000 in whole life insurance, he was attracted to Legacy Point's premium financed life insurance product as a retirement tool. Having an ILIT hold the life insurance policy would result in tax advantages, and, by financing the premiums, he would pay relatively little up front. Also, Dr. Harris had been a licensed insurance agent since January 2013. Legacy Point promised that if he helped sign up other physicians and people he knew, he could share in insurance commissions to cover the cost of insuring his own life. After shopping two other lenders, Legacy Point identified Global One as a potential

5

lender and began working with Global One's marketing arm, Global Financial Distributors ("Global Distributors"), to purchase the premium financed life insurance policy.

One of the advantages to the proposed financing of this particular life insurance product was that the outstanding principal owed on the loan would never exceed the cash surrender value of the insurance policy. For the ILIT and Dr. Harris, this meant that there would be little risk of potentially owing more money on the loan in the event of a default, as the lender would use the cash surrender value to pay back the entire outstanding principal. For the lender, Global One, this meant that there was little risk of losing any principal on the loan in the event of a default, as the cash surrender value would always exceed the outstanding principal. Even if Global One never collected another penny from the ILIT or Dr. Harris, the outstanding principal was never at risk.

On the other hand, there was still the possibility of prepayment penalties, interest, and fees associated with early termination of the loan. Dr. Harris testified that Legacy Point assured him that Global One would waive any such penalties, interest, and fees in consideration for Dr. Harris's efforts at referring other physicians and acquaintances to purchase similar insurance. The Promissory Note and Security Agreement ("the note") and the personal guaranty contain no hint of

6

any such waiver and the note expressly rejects any oral representations to the contrary.  Exhibit 1, ¶ 12(f).

In June 2014, Global Distributors first proposed making the loan to Dr. Harris's ILIT, which would require a personal guaranty from Dr. Harris. Dr. Harris rejected this first proposal in September 2014 specifically because he did not want to sign a personal guaranty.  Global Distributors understood that it was "very important" for Dr. Harris to not "put up a personal guarantee." Exhibit T.  Around this time, Global Distributors and Legacy Point agreed that they would share the commission earned on the sale of the life insurance policy.

As a workaround, Dr. Harris and Legacy Point proposed that Global One make the loan to an existing corporation that Dr. Harris controlled.  Global Distributors represented that making the loan to a corporation would not require a personal guaranty from Dr. Harris.  When loaning to Dr. Harris's existing corporation proved unworkable, Legacy Point next proposed that Dr. Harris create a new corporation to take out the loan.  Dr. Harris formed a new corporation and named it Galaxy Investors, Inc.  This too was fruitless.  In November 2014, the insurer, Lincoln Financial Group ("Lincoln Financial"), declined to issue the life insurance policy with Galaxy Investors, Inc. as the signatory on the loan.

Consequently, Global Distributors, Legacy Point, and Dr. Harris were back at square one. On November 13, 2014, Global Distributors sent Legacy Point a draft personal guaranty that Dr. Harris would need to sign to satisfy Lincoln Financial. The ILIT would again be the borrower. On November 24, 2014, Mr. Sloan signed an ILIT Borrower Loan Underwriting Form ("underwriting form"), detailing Dr. Harris's assets—in particular, listing $7,500,000 in "business value." Exhibit 21. On November 26, 2014, Global Distributors sent Legacy Point thirteen documents, two of which are of particular importance: first, the note, which Mr. Sloan signed as trustee of the ILIT, and, second, the personal guaranty Dr. Harris was to sign. On December 1, 2014, Dr. Harris signed the personal guaranty at his office. Legacy Point did not explain the personal guaranty to him or bring it to his attention. Nor did Dr. Harris read the documents, including the personal guaranty. The next day, Global Distributors sent the personal guaranty to Lincoln Financial along with the other documents and finalized the premium financed life insurance policy.

The Court can only speculate as to exactly how Dr. Harris came to sign the personal guaranty on December 1, 2014, after having repeatedly expressed his unwillingness to do so. Perhaps John Loudon or Byron Holley had convinced Dr. Harris that this was the only way to obtain financing for the life insurance

8

Dr. Harris wanted. Perhaps John Loudon and Byron Holley just figured that Dr. Harris would sign the many papers, including the personal guaranty, without reading them. In any event, Dr. Harris signed the personal guaranty on December 1, 2014.

Although the Court does not know the exact amount of the insurance commission, based on testimony from Mr. Rosen, Lincoln Financial would have paid a total commission of about $30,000 on the insurance policy. By agreement between Global Distributors and Legacy Point, Global Distributors would receive ten percent or approximately $3,000 for assisting Legacy Point in applying for the loan with Global One.

Under the loan agreement, Global One agreed to finance annual insurance premiums of approximately $341,000 per year for each of the first seven years. During that period, the ILIT was required to make interest payments only. For example, interest payments for the first year were on approximately $341,000 of principal. Interest payments for the second year were on approximately $682,000 of principal. And interest payments for the third year were on approximately $1,023,000 of principal.

The ILIT timely made the monthly interest payments required under the note for the first two years; however, Dr. Harris continued to struggle financially. By

9

early 2017 his home was in foreclosure and he was unable to make the monthly interest payment due on February 1, 2017, for $3,733.05.

On February 14, 2017, Global One notified Dr. Harris and Mr. Sloan that the ILIT was in default on the note.  Global One gave the ILIT until March 1, 2017, to cure the default.  The ILIT did not.  On May 8, 2017, Global One surrendered the life insurance policy to Lincoln Financial.  On May 15, 2017, Global One notified Dr. Harris and Mr. Sloan that it applied the surrender proceeds of the life insurance policy to the note and, that as of May 8, 2017, the ILIT owed Global One $101,265.15.  About two months later, Global One filed suit in the United States District Court for the Northern District of Georgia against Dr. Harris and Mr. Sloan to collect the amount owed.

## DISCUSSION

### *The Request for an Adverse Inference*

On direct examination, Mr. Sloan testified that he is a certified public accountant.  He summarized his educational and employment background and his knowledge of underwriting and auditing.  When counsel for the debtors asked him about the ILIT, Mr. Sloan stated that because of Synovus's "threat of litigation" he would not answer any questions regarding his role as trustee.  The "threat" was a

10

letter that counsel for Synovus sent him that he feared might put his license at risk, or worse.  Exhibit A to Docket No. 224.

Before the hearing, Mr. Sloan had prepared an expert report, marked as Exhibit P, detailing his opinion as to whether Global One should have made the loan to the ILIT.  The Court disallowed any inquiry into Mr. Sloan's opinion, finding the debtors failed to prove its relevance.  Ultimately, the debtors requested that the Court strike Mr. Sloan's direct examination testimony in its entirety, which the Court granted.

Counsel for Synovus requested that the Court allow them to cross examine Mr. Sloan, even if his direct examination testimony was stricken, as they wanted the Court to take an adverse inference from his refusal to testify about his role as trustee.  On cross examination, Mr. Sloan first testified to the ethical requirements associated with being a certified public accountant.  He next explained that he met Dr. Harris while studying at Case Western Reserve University and has been his very close friend since then.

Finally, counsel for Synovus asked Mr. Sloan about his role as trustee.  The exchange was as follows:

> Question:  As trustee of Dr. Harris's trust, were you consulted when Dr. Harris decided to apply for a life insurance policy marketed by Legacy Point?

Response: I will answer no questions regarding my role, assumed or
          alleged, as trustee.
Question: Are you pleading the Fifth?
Response: I am pleading the Fifth.

After Mr. Sloan's invocation of the Fifth Amendment, Synovus requested that the

Court take an adverse inference against Mr. Sloan. The Court stated that it would

not take a "generic" adverse inference based on Mr. Sloan's refusal to testify but

would consider an adverse inference regarding specific questions. Counsel for

Synovus resumed their cross examination:

Question: Mr. Sloan, will you testify as to your role as trustee in
          signing any of the underlying loan documents that are the
          subject of this claim?
Response: I previously answered that by saying I would not with the
          threat of civil and criminal prosecution being out there.
. . . .
Question: Will you testify as to your role as trustee regarding the
          veracity of the financial information that was provided to
          Global One underlying the loan that is the subject of this
          claim?
Response: I previously answered that.
Question: Would you care to repeat your answer?
Response: I've answered that question twice if not three times for you
          already.
Question: Mr. Sloan, will you testify as to whether or not you signed
          the disclosures and other forms that are the basis of the—
          that go along with the loan documents that are the basis of
          this loan dispute.
Response: I've answered that question as well, sir.

12

The Court finds an adverse inference regarding the second question—the veracity of the financial information that Mr. Sloan provided to Global One—to be conditionally relevant.

The Fifth Amendment to the United States Constitution provides, in part, that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has concluded that "the Fifth Amendment does not forbid adverse inferences against *parties* to *civil actions* when they refuse to testify in response to probative evidence against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976) (emphasis added). While the plain language of *Baxter v. Palmigiano* would appear to limit the adverse inference to plaintiffs and defendants in civil proceedings (*i.e.*, parties), the Sixth Circuit has extended the adverse inference to third-party witnesses. *See Davis v. Mut. Life Ins. Co. of New York*, 6 F.3d 367, 384–85 (6th Cir. 1993) ("no reason to distinguish a party's invocation of the privilege from that of a non-party witness, since the inference to be drawn in either case runs against the defendant."); *accord Pyles v. Johnson*, 136 F.3d 986, 997 (5th Cir. 1998) (also true that the Fifth Amendment does not forbid adverse inferences against third-party witnesses in civil actions); *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (providing a list of non-exclusive factors to guide the trial court); and *Rad*

13

*Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 275 (3d Cir. 1986) (same

policies underlying the privilege that permit an adverse inference against a party

likewise allow an adverse inference against a non-party). Even so, the evidence—

that is, the adverse inference—must be relevant to be admissible. Fed R. Evid. 401

and Fed. R. Bankr. P. 9017; *see also Mirlis v. Greer*, 952 F.3d 36, 45 (2d Cir.

2020) ("To be admissible, a witness's invocation of the Fifth Amendment privilege

against self-incrimination must satisfy Federal Rules of Evidence 401 and 403.").

The *LiButti* factors provide a useful framework to assess the admission of an

adverse inference against a non-party for their invocation of the Fifth Amendment.

The four factors are: (1) the nature of the relevant relationship, (2) the degree of

control of the party over the non-party, (3) the compatibility of interest of the party

and the non-party witness in the outcome of the litigation, and (4) the role of the

non-party witness in the litigation. *LiButti*, 107 F.3d at 123. The four factors

support admitting an adverse inference against Mr. Sloan.

The Court should examine the first factor "from the perspective of a

non-party witness' loyalty to the plaintiff or defendant . . . . The closer the bond,

whether by reason of blood, friendship, or business, the less likely the non-party

witness would be to render testimony in order to damage the relationship." *Id*.

Both Dr. Harris and Mr. Sloan testified that they met while in college and have

14

been close friends for many years. The second factor concerns "[t]he degree of control which the party has vested in the non-party witness in regard to key facts and general subject matter of the litigation." *Id*. Dr. Harris appointed Mr. Sloan as trustee of his ILIT. Mr. Sloan, as trustee of the ILIT, signed for the loan that is at the heart of this claim objection. Additionally, Mr. Sloan provided Global One and Global Distributors the underwriting form as proof of Dr. Harris's and the ILIT's creditworthiness. Third, the Court asks, "whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation." *Id*. Mr. Sloan in his capacity as trustee of the ILIT is a named party in the Northern District of Georgia litigation that this bankruptcy case stayed. While he is likely not personally responsible for the amount owed on the note, he has some interest in the outcome of this litigation. Lastly, the Court should consider "[w]hether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects." *Id*. at 123-24. Again, Mr. Sloan's role as trustee of the ILIT that incurred the debt is central to this litigation.

The four factors lead this Court to take the following adverse inference against Mr. Sloan for invoking his Fifth Amendment privilege: that Mr. Sloan

15

knowingly provided Global One inflated information regarding Dr. Harris's finances. Even if the Court were to take no adverse inference from Mr. Sloan's testimony, there is ample, independent evidence in the record to establish that Mr. Sloan provided inflated financial information to Global One—for example, by asserting that Dr. Harris had $7,500,000 in "business value." Exhibit 21.

## The Burden of Proof

The debtors object to Synovus's claim under 11 U.S.C. § 502. Section 502(a) provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." Debtors in chapter 13 cases may object to claims as "part[ies] in interest." 4 Collier on Bankruptcy ¶ 502.02[2][c] (16th 2021). A proof of claim filed in accordance with the bankruptcy rules is prima facie valid. Fed. R. Bankr. P. 3001(f). The objecting party has the burden of rebutting the presumption of validity. *In re Leatherland Corp.*, 302 B.R. 250, 259 (Bankr. N.D. Ohio 2003) (*citing In re Nelson*, 206 B.R. 869, 878 (Bankr. N.D. Ohio 1997)). They must "produce[] evidence to refute at least one of the allegations essential to the claim's legal sufficiency. The claimant ultimately bears the burden of proving the validity of the claim by a preponderance of the evidence." *In re Bavelis*, No. 13-8015, 2013 WL 6672988, at *12 (B.A.P. 6th Cir. Dec. 19, 2013) (*quoting In re Hughes*,

16

313 B.R. 205, 208 (Bankr. E.D. Mich. 2004)), *aff'd*, 773 F.3d 148 (6th Cir. 2014).

However, "the burden of proof is an essential element of the claim itself; one who

asserts a claim is entitled to the burden of proof that normally comes with it."

*Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 21, 120 S. Ct. 1951, 1955 (2000).

Therefore, "if a debtor's objection to a claim is based on an affirmative defense for

which the debtor would have the burden of proof outside of bankruptcy, the debtor

must carry that same burden of proof in prosecuting the objection." *In re Bavelis*,

571 B.R. 278, 379–80 (Bankr. S.D. Ohio 2017), *objections sustained in part and*

*overruled in part sub nom. Bavelis v. Doukas*, No. 2:17-CV-0327,

2019 WL 101916 (S.D. Ohio Jan. 4, 2019), *aff'd in part, vacated in part,*

*remanded*, 835 F. App'x 798 (6th Cir. 2020).

Throughout this case, the debtors objected to Synovus's claim on multiple

grounds with varying levels of legal precision. The debtors' arguments can be

reduced to three main allegations: (1) the claim is improper because it is for

unmatured interest, (2) Global One procured the loan by fraudulent inducement,

and (3) the loan is invalid because Global One lacked a premium finance license in

Ohio.

17

*Unmatured Interest*

Synovus's claim is for $122,338.11. The amount includes a loan commitment fee of $71,651.58 under sections 3(d) and 3(c)(ii) of the note, $13,065.47 of interest under section 2(b) of the note, $16,548.10 of default interest under section 2(d) of the note, and $10,151.51 in attorney's fees under section 12(d) of the note, calculated under Georgia law.

The loan commitment fee operates in tandem with the prepayment fees in section 3(c)(ii) of the note to calculate the prepayment fee due upon default. The ILIT's default on the note occurred on February 1, 2017, which was the third year after the signing of the note. Section 3(c)(ii) of the note calculates the prepayment fee in the third year as three percent of the portion of the loan prepaid. Therefore, the prepayment fee was three percent of $2,388,386.00, equaling $71,651.58. Fees of this type are variously known as make-whole premiums or prepayment penalties. Thompson Reuters Practical Law Glossary Item 0-382-3702. No matter their label, these clauses "approximate damages resulting from prepayment"— meaning the loss of expected interest. 15 Am. Bankr. Inst. L. Rev. 537, 538 (2007).

11 U.S.C. § 502(b)(2) disallows claims for "unmatured interest." The Bankruptcy Code does not define unmatured interest; however, courts have defined

18

it as "interest that is not yet due and payable" at the time of a bankruptcy filing.

*See, e.g., In re Sadler*, No. 1:14CV2312, 2015 WL 9474174, at *2 (N.D. Ohio

Dec. 29, 2015) (accepting bankruptcy court's definition of unmatured interest as

"interest that is not yet due and payable or is not yet earned at the time of the filing

of the petition"); *In re Ultra Petroleum Corp.*, 624 B.R. 178, 187 (Bankr. S.D. Tex.

2020) (on remand, concurring with the Northern District of Ohio definition in *In re*

*Sadler*); and *HSBC Bank USA, Nat. Ass'n v. Calpine Corp.*,

No. 07 CIV 3088 GBD, 2010 WL 3835200, at *5 (S.D.N.Y. Sept. 15, 2010)

(collecting cases that define unmatured interest as "interest that is not yet due and

payable at the time of a bankruptcy filing, or is not yet earned").

Under the note in this case, the prepayment amount became due upon the

ILIT's default, which occurred on February 1, 2017.  The debtors filed for

chapter 13 bankruptcy on November 1, 2018.  The timing is important.  While the

prepayment amount might approximate expected interest, because of the ILIT's

default, that approximated interest fully matured prepetition.  *In re Drs. Hosp. of*

*Hyde Park, Inc.*, 508 B.R. 697, 706 (Bankr. N.D. Ill. 2014) ("[O]therwise unearned

interest became fully mature because of the breach, which accelerated the due

dates to before the bankruptcy filing.").  "A prepayment charge imposed

prepetition is not a claim for unmatured interest within the meaning of

19

§ 502(b)(2)." *In re Hidden Lake Ltd. P'ship*, 247 B.R. 722, 730 (Bankr. S.D. Ohio 2000) (*citing In re Skyler Ridge*, 80 B.R. 500, 508 (Bankr. C.D. Cal. 1987) and *In re Outdoor Sports Headquarters, Inc.*, 161 B.R. 414, 424 (Bankr. S.D. Ohio 1993)). Therefore, Synovus's claim for $71,651.58 in prepayment fees is not for unmatured interest and is permissible under 11 U.S.C. § 502(b)(2).

*Fraudulent Inducement*

*a. Choice of Law*

In paragraph 12(e), the note states that, "The law of the state of Georgia will govern this Agreement." The personal guaranty also specifies that, "This instrument shall be governed by the laws of the state of Georgia, without giving effect to principles of conflict of law." Synovus argues that Georgia law applies while the debtors contend that this Court should apply Ohio law to the dispute. As explained more fully below, whether one applies the choice of law rules of Georgia, where Synovus filed its diversity action in federal court in 2017, or the choice of law rules of Ohio, where this bankruptcy court sits, or federal choice of law rules, the result in this case is the same.

Federal courts are split on whether to apply state or federal choice of law rules to bankruptcy cases. *In re Miller*, 459 B.R. 657, 671 (B.A.P. 6th Cir. 2011) (*comparing Lindsay v. Beneficial Reins. Co. (In re Lindsay)*, 59 F.3d 942, 948 (9th

20

Cir. 1995) (applying federal choice of law rules to a bankruptcy case) *with Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 605-06 (2d Cir. 2001) (applying forum state choice of law rules to a bankruptcy case)), *aff'd*, 513 F. App'x 566 (6th Cir. 2013).

In *In re Dow Corning Corp.*, 778 F.3d 545, 551 (6th Cir. 2015), the Sixth Circuit addressed a slightly different issue: what law to apply to a tort action brought in a diversity action but transferred to another forum under 28 U.S.C. § 157(b) when the defendant filed for bankruptcy. As the Sixth Circuit explained in *Dow Corning*:

> The Second Circuit recently applied the rule of *Van Dusen* [*v. Barrack,* 376 U.S. 612, 84 S. Ct. 805 (1964),] and *Ferens* [*v. John Deere Co.,* 494 U.S. 516, 110 S. Ct. 1274 (1990),] to a similar situation, and that analysis informs our own. In *In re Coudert Brothers LLP,* 673 F.3d 180 (2d Cir. 2012), the court dealt with which choice of law rule to apply to a preexisting tort claim later considered as an adversary proceeding in bankruptcy. The bankruptcy court, which sat in New York, applied New York's choice of law rules. The Second Circuit reversed:
>
> > Extending the well-established rule of *Van Dusen v. Barrack* and *Ferens v. John Deere Co.,* we hold that in a case such as this one, where: (1) the claim before the bankruptcy court is wholly derived from another legal claim already pending in a parallel, out-of-state, non-bankruptcy proceeding; and (2) the pending original, or "source," claim was filed in a court prior to the commencement of the bankruptcy case, bankruptcy courts should apply the choice of law rules of the state where the underlying prepetition claim was filed.

21

*Id*. at 182 (internal citations omitted). The court noted that "it would be fundamentally unfair to allow [the] bankruptcy . . . to deprive [the plaintiff] of the state-law advantages adhering to the exercise of its venue privilege." *Id*. at 190. The plaintiff had filed suit in Connecticut—the case was only in New York because of the defendant's bankruptcy. Under those circumstances, to apply the law of the forum state "would be to allow the defendant . . . to use a device of federal law (the bankruptcy code) to choose the forum and accompanying choice of law—a practice forbidden by [*Van Dusen* and *Ferens*]." *Id*. at 190–91.

*Coudert Brothers* is persuasive, and we apply its reasoning to venue transfers of state law personal injury and wrongful death claims under § 157(b)(5).

778 F.3d at 551.

In the present case, Synovus originally filed a diversity action against

Dr. Harris and Mr. Sloan in the United States District Court for the Northern

District of Georgia. That action was then stayed when Dr. Harris and his wife later

filed this chapter 13 bankruptcy case in the United States Bankruptcy Court for the

Northern District of Ohio. Although Synovus's federal district court case was not

removed to this Court under 28 U.S.C § 157(b), Synovus's proof of claim is

essentially a continuation of the same claim pending against Dr. Harris in the

Northern District of Georgia. And while the Sixth Circuit's precise holding in

*Dow Corning* may not technically apply to the debtors' objection to Synovus's

claim currently before this Court, the reasoning behind the holding of the Sixth

Circuit in *Dow Corning* and the holding of the Second Circuit in *Coudert Brothers* is equally apt here.

*Georgia Choice of Law*

Georgia will enforce "the jurisdiction chosen by parties to a contract to govern their contractual rights . . . unless application of the chosen law would be contrary to the public policy or prejudicial to the interest of this state." *CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc.*, 283 Ga. 426, 428, 659 S.E.2d 359, 361 (2008) (*citing Convergys Corp v. Keener*, 276 Ga. 808, 810, 582 S.E.2d 84, 85–86 (2003)). The analysis is therefore straightforward: Georgia would apply Georgia law, as the parties chose.

Furthermore, the result would be same if the Court were to apply Ohio or federal choice of law rules instead of Georgia choice of law rules. "When all roads lead to the same result, there is no conflict to resolve." *In re Dow Corning Corp.*, 778 F.3d at 555 (Sutton, J., dissenting) (*citing CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008)).

*All Roads Lead to Georgia*

Both Ohio and federal choice of law rules apply the Restatement (Second) Conflict of Laws. *See In re Miller*, 459 B.R. at 673 (*citing Medical Mut. Of Ohio v. deSoto*, 245 F.3d 561, 570 n.9 (6th Cir. 2001)) (concluding that federal

23

choice of law analysis begins with the Restatement (Second) of Conflict of Laws);

and *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co*., 6 Ohio St. 3d 436, 438,

453 N.E.2d 683, 686 (1983) (Ohio Supreme Court applying Restatement of Law

2d (1971) 561, Conflict of Laws, Section 187); *see also Wise v. Zwicker & Assocs.,*

*P.C.*, 780 F.3d 710, 714-15 (6th Cir. 2015) ("Ohio has adopted sections 87

and 188 of the Restatement (Second) of Conflict of Laws to govern choice of law

in contract disputes. . . . [T]he Sixth Circuit, in cases under federal common law,

has also adopted these sections and the Ohio approach to applying them . . . .")

(internal citation omitted).

Under the Restatement (Second) of Conflict of Laws § 187(2), when the

parties to a contract have chosen a state's laws to apply, a court should apply that

state's laws unless:

> (a) the chosen state has no substantial relationship to the parties or the
> transaction and there is no other reasonable basis for the parties'
> choice, or
>
> (b) application of the law of the chosen state would be contrary to a
> fundamental policy of a state which has a materially greater interest
> than the chosen state in the determination of the particular issue and
> which, under the rule of § 188, would be the state of the applicable
> law in the absence of an effective choice of law by the parties.

Global One is a Georgia corporation with its headquarters in Georgia. Mr. Rosen,

the founder of Global One, testified that Global One included the Georgia choice

24

of law provision to provide uniformity for a product it sells throughout the country. Therefore, the parties have a substantial relationship to Georgia, and there is a reasonable basis for the choice of Georgia law. As to the second question—whether Ohio has a "materially greater interest" and, if so, whether applying Georgia law would violate a fundamental public policy of Ohio—the debtors generally allege that the loan is a consumer loan and allowing Synovus to collect the attorney's fees in section 12(d) of the note would violate Ohio public policy.

While Dr. Harris is an Ohio resident and the note and personal guaranty were signed in Ohio, Ohio does not have a materially *greater* interest than Georgia in this case. *See Sekeres v. Arbaugh*, 31 Ohio St. 3d 24, 25–26, 508 N.E.2d 941, 942 (1987) ("While it is true that the agreement was signed in Ohio and that [the plaintiff] is an Ohio resident, Ohio was neither the place of performance of the contract nor the place where it was given final approval."). Even if Ohio had a materially greater interest than Georgia, allowing attorney's fees in this case would not violate Ohio public policy.

Ohio allows the recovery of attorney's fees stipulated in a contract where there is equal bargaining power between the parties or where a statute authorizes it. *Wilborn v. Bank One Corp.*, 2009-Ohio-306, ¶ 7, 121 Ohio St. 3d 546, 548, 906 N.E.2d 396, 400 (*citing Nottingdale Homeowners' Assn., Inc. v. Darby*,

25

33 Ohio St. 3d 32, 34, 514 N.E.2d 702, 704 (1987)); *see also Saad v. GE HFS Holdings, Inc.*, 366 F. App'x 593, 605 (6th Cir. 2010) (holding that because the parties were not of unequal bargaining power and Ohio law expressly allows for attorney's fees, the attorney's fees provisions at issue were not contrary to Ohio public policy); and *Allied Indus. Scrap, Inc. v. OmniSource Corp.*, 776 F.3d 452, 453 (6th Cir. 2015) (recognizing that the Ohio Supreme Court's decision in *Wilborn* generally allows parties to shift attorney's fees through contracts). By statute, Ohio authorizes attorney's fees for the enforcement of loans that are not "primarily personal, family, or household" and that exceed $100,000. Ohio Rev. Code § 1319.02. A separate section of the code defines a consumer transaction as "a sale, lease, assignment, [etc.] . . . to an *individual* for purposes that are primarily personal, family, or household." Ohio Rev. Code § 1345.01(A) (emphasis added). The Bankruptcy Code similarly defines a consumer debt as a "debt incurred by an *individual* primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8) (emphasis added).

While the loan was made to purchase insurance on the life of Dr. Harris, the borrower was the ILIT. Indeed, ILITs are created specifically for the tax benefits associated with having an entity other than the insured actually own the insurance policy. The "I" in ILIT is for "irrevocable" because the transfer of ownership in

26

the insurance policy must be irrevocable for the tax benefits to apply. *See* I.R.C. § 2042 and 26 C.F.R. § 20.2042-1.

As Ohio law would permit the collection of attorney's fees for the ILIT's default, an award of attorney's fees in this case would not be contrary to Ohio public policy. Accordingly, all roads lead to the application of Georgia law to the note and personal guaranty.

### b. Fraud in the Inducement in Georgia

Under Georgia law, fraud is an affirmative defense. Ga. Code Ann. § 9-11-8(c). The fraud must have induced the party to enter the contract. *Castellana v. Conyers Toyota*, 200 Ga. App. 161, 165, 407 S.E.2d 64, 67 (1991) (*quoting Hudson v. Montcalm Pub. Corp.*, 190 Ga. App. 629, 631, 379 S.E.2d 572, 575 (1989)). Fraud in the inducement requires that the debtors prove (1) a false representation by Global One, (2) scienter, (3) an intention to induce Dr. Harris to act or refrain from acting, (4) justifiable reliance by Dr. Harris, and (5) damage to Dr. Harris. *Stafford v. Gareleck*, 330 Ga. App. 757, 762, 769 S.E.2d 169, 173 (2015) (*quoting Sims v. Bayside Cap., Inc.*, 327 Ga. App. 47, 51, 755 S.E.2d 520, 524 (2014)). Additionally, Dr. Harris must show that he exercised due care to discover the fraud. *Dr. Pepper Fin. Corp. v. Cooper*, 215 Ga. 598, 601, 112 S.E.2d 585, 587 (1960) (citations omitted). Most importantly for this case,

27

"the only type of fraud that can relieve a party of his obligation to read a written contract and be bound by its terms is a fraud that prevents the party from reading the contract." *Legacy Acad., Inc. v. Mamilove, LLC*, 297 Ga. 15, 17, 771 S.E.2d 868, 871 (2015) (*quoting Novare Grp., Inc. v. Sarif*, 290 Ga. 186, 189, 718 S.E.2d 304, 308 (2011)).

In *Legacy Academy,* two sisters (one with a master's degree in business administration) were interested in purchasing a daycare franchise from Legacy Academy Center. 771 S.E.2d. at 869. At their initial meeting, Legacy Academy gave the sisters figures for the historical earnings of existing franchisees. *Id*. A few months after the initial meeting, an officer of Legacy Academy again met with the sisters to have them sign the franchise agreement. *Id*. The sisters signed the agreement that same day without reading it. *Id*. A decade later, the sisters sued to rescind the franchise agreement, "alleging that Legacy Academy fraudulently induced them to sign the [franchise agreement] by providing false information about the historical earnings of existing Legacy Academy franchisees." *Id*. at 869-70.

The trial court denied Legacy Academy's motion for a directed verdict and the jury found for the sisters. *Id*. at 870. Legacy Academy appealed. *Id*. The Georgia intermediate appellate court affirmed. *Id*. The appellate court held that

28

the sisters' failure to read the franchise agreement "was excused because the jury would have been authorized to find that Legacy intentionally prevented the [sisters] from reading the [franchise agreement] based on evidence that they gave the [franchise agreement] to the [sisters] on the same day it was signed and told them that they had to sign the documents that day or another franchisee would be allowed to take their desired location." *Id*. at 871.

The Georgia supreme court disagreed and reversed in part, finding the evidence "legally insufficient to support a finding that the [sisters] were prevented from reading the [franchise agreement] through fraud or misleading artifice." *Id*. Rather, the sisters "blindly relied" on Legacy Academy's representations because they wanted to quickly begin construction on their own franchise. *Id*. Moreover, the franchise agreement itself expressly stated that Legacy Academy "had made no representations and [the sisters] were not given or relying on any representations by Legacy [Academy] regarding potential volume, [etc.] . . . ." *Id*. The *Legacy Academy* court cited to two other cases to support its finding: *Budget Charge Accts., Inc. v. Peters*, 213 Ga. 17, 18, 96 S.E.2d 887, 888 (1957) ("[T]he mere allegation that the agent of the defendant grantee was in a hurry to catch a plane to his home office is totally insufficient to allege an emergency excusing the petitioners from reading the instruments."); and *Citizens Bank, Vienna v. Bowen*,

29

169 Ga. App. 896, 897, 315 S.E.2d 437, 439 (1984) (evidence that the defendants covered part of the document and the plaintiffs were in a hurry was insufficient to prove fraud because it did not prevent the plaintiff from reading the documents).

On direct examination, Dr. Harris repeatedly stated he never would have personally guaranteed the loan and that he made this clear to John Loudon and Byron Holley at Legacy Point. In fact, Dr. Harris previously rejected the loan because Global One required a personal guaranty. But on cross-examination, Dr. Harris admitted that (a) he did not read any of the documents before signing them (including the personal guaranty), relying on Byron Holley's alleged assertion that they did not include a personal guaranty, and (b) because he had multiple patients the day he signed the documents, he was in a hurry. The facts in this case are similar to *Legacy Academy* and lead to the same result. Byron Holley did not prevent Dr. Harris from reading the personal guaranty—even if he may have misrepresented its existence. Moreover, Dr. Harris's busy medical practice does not excuse his failure to read the personal guaranty.

Even if Dr. Harris could establish that Byron Holley prevented him from reading the personal guaranty, the debtors have failed to prove that John Loudon and/or Byron Holley were agents of Global One. It is true that under Georgia law "[a] principal who accepts a contract procured by fraudulent conduct of an agent,

30

regardless of such agent's authority, is bound by such fraudulent conduct of the agent in procuring such contract." *Potomac Leasing Co. v. Thrasher*, 181 Ga. App. 883, 884, 354 S.E.2d 210, 212 (1987) (*quoting W. T. Rawleigh Co. v. Kelly*, 78 Ga. App. 10, 10, 50 S.E.2d 113, 114 (1948)). An agency relationship "arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another on his behalf." Ga. Code Ann. § 10-6-1. Agency requires "consent by one person to another that the other shall act on his behalf and *subject to his control*, and consent by the other so to act." *Aetna Ins. Co. v. Glens Falls Ins. Co.*, 453 F.2d 687, 690–91 (5th Cir. 1972) (*quoting* Restatement (Second) of Agency § 1).

There were five parties involved in the loan in this case: first, Global One, who made the loan to finance the life insurance policy premiums; second, Global Distributors, who marketed Global One's premium financing loans; third, Legacy Point, the insurance agents that sold the life insurance policy and accompanying loan; fourth, the ILIT that bought the insurance policy and took out the loan; and, fifth, Dr. Harris, who personally guaranteed the loan.

The debtors allege that Legacy Point and its employees were agents of Global One and/or Global Distributors. They point to an email where an employee of Global Distributors identifies John Loudon at Legacy Point as "our agent" in the

31

transaction and to the fact that Global Distributors and Legacy Point shared in the commission earned through the sale of the life insurance policy. Exhibit T. The fact that Global Distributors informally referred to John Loudon as "our agent" on a single occasion in an email is insufficient to prove an agency relationship. *See Aetna Ins. Co.*, 453 F.2d at 690 (*citing Warnock v. Elliott*, 96 Ga. App. 778, 789, 101 S.E.2d 591, 599 (1957)) ("[A]n agency is not proved by the assertion of a witness that a person is or is not an agent."). Nor is the fact that Global Distributors and Legacy Point shared the commission sufficient to prove agency. *See Richardson v. DuPree*, 32 Ga. App. 3, 122 S.E. 707 (1924) (payment of compensation alone does not create agency). There is no evidence that Global One and/or Global Distributors *controlled* Legacy Point in any way, much less sufficiently to establish an agency relationship. *See Satisfaction & Serv. Hous., Inc. v. SouthTrust Bank, Inc.*, 283 Ga. App. 711, 713, 642 S.E.2d 364, 365–66 (2007) (debtor that resold loans to a bank was not acting as the bank's agent as there was no evidence that the bank had the right to control the time, manner, and method of the debtor's work, even though the debtor earned money from the loans it sold to the bank). In fact, the record shows that, if an agency relationship existed between Global Distributors and Legacy Point, it was Global Distributors that served briefly as an agent for Legacy Point. In recognition of the assistance Global

32

Distributors provided in obtaining a loan to finance the purchase of the insurance policy by the ILIT, Legacy Point agreed to give Global Distributors 10 percent of the insurance commission it received from Lincoln Financial. Exhibits D and E. Accordingly, the debtors have not met their burden in proving that Legacy Point acted as an agent for Global One and/or Global Distributors.

### c. Fraud in the Inducement in Ohio

Even if this Court were to apply Ohio law as the debtors request, the result would be the same. In Ohio, as in Georgia, fraudulent inducement is an affirmative defense. *Am. Outdoor Advert. Co. v. P&S Hotel Grp., Ltd.*, No. 09AP-221, 2009-Ohio-4662, ¶ 25 (10th Dist. Ct. App. Sept. 8, 2009) (citations omitted). The elements of fraudulent inducement are similar in Ohio; namely, the debtors must prove that Global One made a knowing, material misrepresentation with the intent of inducing Dr. Harris's reliance and that Dr. Harris relied upon that misrepresentation to his detriment. *ABM Farms, Inc. v. Woods*, 1998-Ohio-612, 81 Ohio St. 3d 498, 502, 692 N.E.2d 574, 578 (*citing Beer v. Griffith*, 61 Ohio St. 2d 119, 123, 399 N.E.2d 1227, 1231 (1980)). Under Ohio law, Dr. Harris must prove fraudulent inducement by clear and convincing evidence. *DeJohn v. DiCello*, 2011-Ohio-471, No. 94785, 2011 WL 345957, ¶ 46 (8th Dist. Ct. App.

33

Feb. 3, 2011) (*citing Mid-Am. Tire, Inc. v. PTZ Trading Ltd*., 2002-Ohio-2427,

¶ 62, 95 Ohio St. 3d 367, 376, 768 N.E.2d 619, 628).

"A classic claim of fraudulent inducement asserts that a misrepresentation of

facts outside the contract or other wrongful conduct induced a party to enter into

the contract." *ABM Farms*, 81 Ohio St. 3d at 503, 692 N.E.2d at 578. Like in

Georgia, an individual in Ohio "cannot be heard to say that he was misled into

signing a paper which was different from what he intended, when he could have

known the truth by merely looking when he signed." *Pennington v. Frisch's*

*Restaurants, Inc.*, 147 F. App'x 463, 466 (6th Cir. 2005) (*quoting McAdams v.*

*McAdams*, 80 Ohio St. 232, 240–41, 88 N.E. 542, 544 (1909)).

At best, Byron Holley misrepresented to Dr. Harris the existence of the

personal guaranty. That is, he failed to explain what was *in* the contract. *See ABM*

*Farms,* 81 Ohio St. 3d at 503, 692 N.E.2d at 578–79 ("In this case, [the plaintiff]

alleges that [the defendant] failed to tell her what was *in* the contract. At the center

of [the plaintiff's] allegation of fraudulent inducement is the naked truth that [the

plaintiff] did not read the contract. It drives a stake into the heart of [the

plaintiff's] claim."). For similar reasons, the Court rejects Dr. Harris's defense of

fraudulent inducement in this case.

34

*Ohio Premium Financing License*

The debtors allege that Global One was not licensed to enter into premium finance agreements in Ohio and, therefore, the loan is invalid. Section 1321.73(A) of the Ohio Revised Code requires entities to obtain a license as a premium finance company before entering into premium finance agreements in Ohio. Under Section 1321.99(F), failure to obtain a license subjects the violator to a fine or imprisonment or both. However, Section 1321.72 provides a variety of exemptions to the licensing requirement in Section 1321.73(A). It appears to the Court that Global One did not require a premium finance license for two reasons. First, Section 1321.71(D) defines a premium finance agreement as "an agreement by which an *insured* or *prospective insured* promises to pay a premium finance company" for the loan. (emphasis added). In this case, the ILIT promised to pay Global One. Dr. Harris—the insured—only personally guaranteed the loan. Second, Section 1321.72(C) exempts "[t]he financing of insurance premiums at a rate of interest not exceeding the maximum rate permitted by section 1343.01 of the Revised Code." Section 1342.01(B)(1), in turn, permits parties to agree to an interest rate above the maximum of eight percent per year when the amount of the loan "exceeds one hundred thousand dollars." As the loan to the ILIT well

exceeded $100,000, it was entirely exempt from the premium finance license requirements no matter the interest rate.

The Court's analysis is consistent with Mr. Rosen's testimony that many states' premium finance lending statutes are intended to regulate the financing of credit life insurance policies—*i.e.*, policies designed to pay off a borrower's vehicle loan if the borrower dies before the vehicle loan is paid in full. Additionally, Mr. Rosen testified that Global One's counsel conducted a survey of premium finance licensing requirements across all fifty states and concluded that Global One fit into one of Ohio's licensing exemptions. The debtors otherwise provided the Court no evidence that Global One was required to be licensed, nor did they raise this argument in any of their written materials to the Court. Given the evidence before it, the Court concludes the debtors have failed to meet their burden in proving Global One was required to be licensed in Ohio. Moreover, it is unclear to the Court what effect, if any, the failure to be licensed would have on the claim at issue.

## Some Final Observations

Although the Court's decision overrules the debtors' objection to Synovus's claim, nothing in this decision should be construed as the Court endorsing the actions of Global One or Global Distributors in marketing and approving the loan

36

to Dr. Harris's ILIT. As noted earlier, Global One and Global Distributors were well aware that Dr. Harris was not the type of high net worth person for whom its insurance premium financing was intended to benefit. But given the design of such insurance premium financing, the lender was virtually guaranteed not to lose a penny of principal in the event of a default, which made it easy for the lender to ignore numerous signs that Dr. Harris and his ILIT or LLC were not a good fit for the lender's insurance premium financing. However, nothing in the Bankruptcy Code gives bankruptcy judges a roving license to do equity as they see fit. *See Law v. Siegel*, 571 U.S. 415, 421, 134 S. Ct. 1188, 1194 (2014) ("We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code.") (*quoting Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S. Ct. 963, 969 (1988)).

In addition, nothing in this opinion should be construed as endorsing the conduct of Legacy Point, John Loudon, or Byron Holley, who are not parties to this contested matter. Indeed, under Bankruptcy Rule 3007, a claim objection cannot include affirmative relief against creditors or third parties. Rather, anything beyond seeking disallowance of a claim requires the commencement of an adversary proceeding.

37

Finally, the Court sets a deadline of February 28, 2022, for filing any supplemental request for attorney's fees for work performed by the debtors' attorney through January 31, 2022. Without deciding the merits of any supplemental fee application that the debtors' attorney may file, the Court finds it appropriate to set a deadline for filing any such application. For example, if granted, any such application would likely be entitled to priority treatment as an administrative expense ahead of general unsecured claims and may affect the feasibility of the debtors' confirmed plan. The application should indicate whether the debtors have consented in writing to the amount requested. *See generally* Second Amended Administrative Order 07-2 at ¶ 8 (addressing procedures for seeking compensation for "novel, complex or non-routine matters").

## CONCLUSION

For the reasons stated above, the debtors' objection is overruled, and Synovus's claim for $122,338.11 is allowed as filed. In addition, the Court sets a deadline of February 28, 2022, for filing any supplemental request for attorney's fees for work performed by the debtors' attorney through January 31, 2022.

IT IS SO ORDERED.

38